# UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OKLAHOMA

BERTIE FULTZ, )
)
)
      Plaintiff, )
)
v. ) No. 06-CV-17-SAJ
)
JO ANNE B. BARNHART, )
Commissioner of Social Security )
Administration, )
)
      Defendant. )

## **OPINION AND ORDER[1]**

Pursuant to 42 U.S.C. § 405(g), Plaintiff appeals the decision of the Commissioner denying Social Security benefits.[2] Plaintiff asserts that the Commissioner erred because (1) the ALJ erred in assessing Plaintiff's residual functional capacity but not including all of Plaintiff's limitations, and, (2) the ALJ erred in assessing Plaintiff's credibility in evaluating Plaintiff's residual functional capacity. For the reasons discussed below, the Court reverses and remands the Commissioner's decision for further proceedings consistent with this opinion.

---

[1] This Order is entered in accordance with 28 U.S.C. § 636(c) and pursuant to the parties' Consent to Proceed Before United States Magistrate Judge.

[2] Administrative Law Judge Lantz McClain (hereafter "ALJ") concluded that Plaintiff was not disabled by decision dated May 19, 2004. [R. at 16 - 28]. Plaintiff appealed the decision by the ALJ to the Appeals Council. The Appeals Council declined Plaintiff's request for review on November 8, 2005. [R. at 4].

## I. FACTUAL AND PROCEDURAL HISTORY

Plaintiff was born May 14, 1952. [R. at 73]. Plaintiff completed the seventh grade in school and started the eighth grade but did not finish high school or obtain a GED. [R. at 136].

Plaintiff completed a disability supplemental interview outline. The form is not dated. [R. at 85]. Plaintiff wrote that on an average day she got her children ready for school and took them to school. Plaintiff returned home and did housework and rested. Plaintiff also picked her children up from school. [R. at 85]. Plaintiff noted that sometimes her daughter did the laundry and cleaned the house when Plaintiff was unable to clean. [R. at 87].

Plaintiff described changes in her routine as including being unable to hold the kids or carry her grandchild. Plaintiff noted she was unable to go boating with her husband or shop at a department store without the assistance of a wheelchair. [R. at 85].

Plaintiff noted that she was able to sleep eight hours each night but that she consistently "tossed and turned" due to back and leg pain. [R. at 85]. According to Plaintiff, she is able to cook, and she makes dinner four to five times each week. [R. at 86]. Plaintiff shops for necessities about two times each week for three to four hours. [R. at 87]. Plaintiff wrote that she did not watch television, but that she listened to gospel music and read the Bible each day. [R. at 88].

Plaintiff visits with friends or relatives twice each week for thirty minutes to one hour at a time. [R. at 89]. Plaintiff attends a weight loss class once each week. [R. at 89].

Plaintiff saw Jack E. Weaver, M.D., from February 9, 2001 until February 28, 2001. [R. at 172]. He noted that Plaintiff had spondylosis of the lumbar spine, especially at the L4-5 joints, and degenerative disk disease of the lumbar spine. He wrote that he discussed

the possibility of a lumbar facet steroid injection, but that Plaintiff was hesitant because she was scared of steroid injections. [R. at 173]. Dr. Weaver noted that he believed Plaintiff's symptoms had worsened in July probably due to Plaintiff's overuse of her back while working. [R. at 175].

Dr. Weaver completed a Lumbar Spine RFC form on April 30, 2004. [R. at 183]. He noted that an MRI in 2000 showed degenerative arthritis of the lumbar spine. He indicated that Plaintiff was not a malingerer. Plaintiff's pain was severe enough to interfere with attention and concentration only on a seldom basis. He believed Plaintiff's impairment would last longer than twelve months, and that Plaintiff could sit for more than two hours at a time and walk for approximately one block. [R. at 183]. Plaintiff could stand for 15 minutes at one time, walk less than two hours and sit approximately two hours. [R. at 184]. He noted Plaintiff required a job that permitted shifting from a standing, sitting, or walking position at will and would need breaks every hour for approximately ten minutes. [R. at 184]. Plaintiff could frequently lift less than 10 pounds and occasionally lift 10 pounds. Plaintiff had no significant limitation on repetitive reaching, handling, or fingering. [R. at 185].

On a form completed by Plaintiff on September 23, 2002, Plaintiff listed Ibuprofen, an over-the-counter medicine, as the only medication that she took for pain. [R. at 105].

Plaintiff completed a pain questionnaire on October 2, 2002. [R. at 113]. Plaintiff noted her daily activities as including taking her children to school and performing household chores. [R. at 113]. Plaintiff wrote that she was unable to walk two miles each day, that she could no longer hold her children in her lap and that she was unable to ride her bicycle due to pain. [R. at 113].

Plaintiff wrote that she experienced burning pain in her shoulders, numbness and pain in her legs, and pain in her knees. [R. at 113]. Plaintiff noted that walking and normal activity caused her pain, and that her activities had been limited since April 17, 2002. [R. at 113]. Plaintiff relieves her pain by relaxing on a massager. Plaintiff listed Ibuprofen as her medication. [R. at 114]. Plaintiff had a spot on her left hand removed which Plaintiff reported was cancerous. Plaintiff amended her medications list to include a topical cream which she noted that she applied twice daily. [R. at 124, 126].

On April 18, 2002, Plaintiff was a new patient at a clinic reporting that while moving a buffer machine from one building to a different building at work she believed she injured her back. Plaintiff noted no pulling at the time, but the following day when she awoke she reported back discomfort and pain in her shoulders and legs. On exam, Plaintiff had no tenderness. All Plaintiff's reflexes were intact. Straight leg raising was negative and toe strength was good. Plaintiff was assessed with mild back strain and was to remain off work for a few days. [R. at 129]. On April 24, 2002, Plaintiff visited the doctor concerning her back. [R. at 128]. Plaintiff reported some back and shoulder discomfort. Plaintiff reported that the medications Bextra and Ultracet had helped her, and on examination Plaintiff's reflexes were intact. Straight leg raising was negative, toe strength was good, and Plaintiff had minimal palpatation to her back. [R. at 128]. The doctor noted that Plaintiff should have a few days off from work and return to work on Monday. [R. at 128].

A radiology report dated May 7, 2002, indicated "vetebral bodies normal height and alignment with maintenance of disc spaces." [R. at 133]. Plaintiff had a negative lumbar

spine. [R. at 133]. Plaintiff was recommended to follow-up with her primary physician, with her return to work date noted as May 13, 2002.   [R. at 134].

Plaintiff was evaluated by Central States Orthopedic Specialists, Inc. on December 2, 2002, for a Court-ordered Independent Medical Evaluation concerning Plaintiff's complaints of lumbar pain. [R. at 169]. Plaintiff complained of low back pain with pain radiating from her low back down her legs and into her feet.  Plaintiff complained of intermittent numbness and tingling. Plaintiff noted her injury occurred when pushing a large powered buffer which strained her back. [R. at 169]. The doctor reviewed Plaintiff's medical records from Dr. Rice at the Payne Clinic and Dr. Martin and Dr. Andrew John. The examiner noted that Plaintiff stated that Dr. Rice wanted to inject her with a steroid, but that Dr. Rice's notes do not reflect Plaintiff's representation.[3/] [R. at 169]. The examiner also noted a prior injury in July 2000 when Plaintiff was lifting boxes. Plaintiff required chiropractic treatment. The examiner noted that Plaintiff complained of bilateral leg pain radiating to Plaintiff's feet, with intermittent numbness and tingling in the legs but no bowel or bladder dysfunction. Plaintiff noted that activities worsened her symptoms. [R. at 169]. Plaintiff was 5'1" tall and weighed 145 pounds. Plaintiff appeared to be in reasonably good shape, and not obese. Plaintiff's lumbar motion was only moderately restricted with forward lumbar flexion of 45 degrees and extension of 20 degrees. Plaintiff could bend to the right and left with no problem. Plaintiff had mild scoliosis of the lumbar spine on examination with mildly prominent left paraspinal hump or prominence on exam. Motor strength was normal. [R. at 170]. AP and lateral x-rays of the spine dated December 2, 2002 were

---

[3/] Dr. Weaver's notes indicate that he discussed steroid injections with Plaintiff, but that Plaintiff was reluctant to try such injections.

reviewed as well as a September 5, 2000 MRI.  The MRI showed spondylotic changes at the L4-5 and L5-S1 levels.  The examiner concluded that Plaintiff likely had a lumbar strain on top of a pre-existing lumbar degenerative disk disease.  The physical exam did not suggest an obvious radiculitis, and neurologically Plaintiff appeared intact.  The examiner proposed a new MRI for comparison with the prior MRI.  He noted that he considered Plaintiff temporarily, totally disabled during the period of evaluation.  [R. at 170].

Plaintiff was examined on December 23, 2002, by Moheb Hallaba, M.D.  [R. at 135].  Plaintiff's gait was normal speed, safe, stable, and without assistive device.  [R. at 135].  Plaintiff noted she was injured on April 17, 2002, while attempting to move a buffer.  Plaintiff tried to work but the pain in her back became severe and she had been unable to work since May 2002.  [R. at 135].  Plaintiff indicated that she had taken Flexeril and Ibuprofen for relief of her back pain.  Plaintiff indicated she had ankle swelling and leg cramps.  [R. at 135].  Plaintiff complained of aching muscles and joints, back pain, difficulty with speech, and nerves.  Plaintiff was five foot and one-fourth inch tall and weighed 153 pounds.  [R. at 136].  On examination, Plaintiff had no limitation of neck extension.  An evaluation of Plaintiff's upper extremities revealed a normal range-of-motion.  [R. at 136].  The evaluation of Plaintiff's back revealed limitation of back extension 15/25 and flexion 70/90.  Plaintiff's lateral flexion was 20/25.  Plaintiff complained of pain in her hip.  [R. at 136].  Plaintiff had mild scoliosis.  Heel and toe walking was normal but Plaintiff was somewhat unstable.  [R. at 136].  The doctor's impressions were that Plaintiff had chronic back syndrome, post-traumatic; possible degenerative arthritis of the spine, degenerative joint disease of the hips, and that Plaintiff was overweight.  [R. at 136].

Plaintiff was evaluated by Jim C. Martin, M.D., on February 13, 2003. [R. at 141]. He noted that Plaintiff had an MRI which indicated spondylosis of the lumbar spine. Plaintiff was treated by Dr. Hendricks but was not approved for physical therapy by her insurance company. [R. at 141]. Plaintiff noted that she had returned to work but that she was experiencing severe pain in performing her job duties as a custodian. [R. at 141]. Plaintiff complained of pain radiating to her hips and buttocks, weakness in her legs, and back pain when attempting to lift, bend, or twist. [R. at 141]. An examination of her back indicated muscle spasms and tenderness over her thoracic and lumbar musculature with point tenderness over the sacroiliac joints and mid buttocks bilaterally. Range of motion of her back indicated flexion to 60 degrees, extension five degrees, lateral flexion 10 degrees bilaterally and rotation 10 degrees bilaterally. Hip flexion angle was 60 degrees and extension angle was five degrees. Plaintiff had a positive straight leg raising test bilaterally at 60 degrees in the supine position. The examiner noted that as a result of Plaintiff's work-related accident, his belief was that she had aggravated her spondylosis of the lumbar spine and had residual injuries to her back with radiculopathy to her hips and lower extremities. [R. at 142]. He gave Plaintiff a 40% impairment to the whole person due to her back injuries. The doctor concluded that considering Plaintiff's education and employment history that she could not return to her prior job duties. "[I]t is my opinion that she should undergo vocational rehabilitation in order to learn a more sedentary type of employment." [R. at 142].

Plaintiff was again examined by Dr. Martin on May 28, 2003. [R. at 157]. Plaintiff complained of significant pain over her neck radiating into her shoulders. [R. at 157]. Plaintiff indicated she had significant pain in her wrists and hands, numbness in her fingers

and difficulty grasping objects with her hands. [R. at 157]. Examination revealed spasm over Plaintiff's cervical muscles and limited range of motion of her cervical spine. [R. at 158]. Plaintiff had normal but painful range-of-movement with her shoulders. [R. at 158]. Plaintiff had pain in each elbow with flexion, extension, supination and pronation of her forearms. [R. at 158]. The doctor concluded that, in his opinion, Plaintiff exhibited musculoligamentous injury to her posterior neck with cervical nerve root injury affecting her shoulder, bursitis with possible impingement of her shoulder, medial and lateral epicondylitis affecting her elbows, and bilateral carpal tunnel syndrome. "It is my opinion that this patient is 100% temporarily totally disabled as a result of these injuries and has been since April 23, 2003." [R. at 159].

A radiology report dated June 24, 2000, showed mild scoliosis of Plaintiff's spine with a moderate compression of T11 and mild marginal spurring at T12-L1. [R. at 167].

A Residual Functional Capacity Assessment was completed on November 18, 2003 by Paul Woodcock, M.D. [R. at 149-156]. Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk six hours in an eight hour day, sit six hours in an eight hour day, and push or pull an unlimited amount. [R. at 150].

Plaintiff was seen by William C. Cheek, M.D., from July 2, 2998 thru March 16, 2004. [R. at 176]. On March 16, 2004, Dr. Cheek noted Plaintiff returned to the office for evaluation of a lesion on her upper eyelid but that he did not believe it was cancer. [R. at 177].

Plaintiff testified at a hearing before the ALJ on November 19, 2003. [R. at 187]. Plaintiff was advised of her right to have an attorney present with her at the hearing. [R.

at 191]. Plaintiff stated that she wanted to have an opportunity to obtain an attorney and the ALJ adjourned the hearing to be set at a later date.

Plaintiff's second hearing before the ALJ occurred on March 30, 2004. [R. at 193]. Plaintiff was 51 years old at the time of the hearing before the ALJ. [R. at 199]. Plaintiff testified that she did not read well. [R. at 199].

Plaintiff worked for four years at Warner Public Schools as a custodian. [R. at 201]. While working in April 2002, Plaintiff had an accident and was treated by some doctors for a workers' compensation claim. [R. at 201]. Plaintiff was released by her doctors to return to work in December 2002. [R. at 202]. Plaintiff returned to work but she was unable to do the work that her job required, and was fired in April 2003. [R. at 202].

Plaintiff believes that her neck is her biggest problem. Plaintiff's neck, shoulders, arms and hands hurt. [R. at 204]. Plaintiff's pain radiates to her hips, legs, and feet. [R. at 206]. Plaintiff also gets headaches which cause her to throw up. [R. at 206].

Plaintiff is able to dress herself and fix herself breakfast in the morning. [R. at 208]. Plaintiff makes her bed, but usually has some assistance. [R. at 209]. Plaintiff sometimes does a chore or activity for about one hour but Plaintiff must rest after one hour for about 30 minutes. [R. at 210]. Plaintiff can carry one gallon of milk. [R. at 210]. Plaintiff can drive about thirty minutes and can walk at least one block and possibly further. [R. at 214].

Plaintiff attends church Sunday morning, Sunday evening and Tuesday night. [R. at 214]. Plaintiff also meets with the ladies' prayer group on Thursday morning. [R. at 214].

## II. SOCIAL SECURITY LAW AND STANDARD OF REVIEW

The Commissioner has established a five-step process for the evaluation of social security claims. *See* 20 C.F.R. § 404.1520. Disability under the Social Security Act is defined as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment
> . . . .

42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act only if his

> physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy. . . .

42 U.S.C. § 423(d)(2)(A).[4]

The Commissioner's disability determinations are reviewed to determine (1) if the correct legal principles have been followed, and (2) if the decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).

---

[4] Step One requires the claimant to establish that he is not engaged in substantial gainful activity (as defined at 20 C.F.R. §§ 404.1510 and 404.1572). Step Two requires that the claimant demonstrate that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 1521. If claimant is engaged in substantial gainful activity (Step One) or if claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, claimant's impairment is compared with those impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings"). If a claimant's impairment is equal or medically equivalent to an impairment in the Listings, claimant is presumed disabled. If a Listing is not met, the evaluation proceeds to Step Four, where the claimant must establish that his impairment or the combination of impairments prevents him from performing his past relevant work. A claimant is not disabled if the claimant can perform his past work. If a claimant is unable to perform his previous work, the Commissioner has the burden of proof (Step Five) to establish that the claimant, in light of his age, education, and work history, has the residual functional capacity ("RFC") to perform an alternative work activity in the national economy. If a claimant has the RFC to perform an alternate work activity, disability benefits are denied. *See Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

The Court, in determining whether the decision of the Commissioner is supported by substantial evidence, does not examine the issues *de novo*. *Sisco v. United States Dept. of Health and Human Services*, 10 F.3d 739, 741 (10th Cir. 1993). The Court will not reweigh the evidence or substitute its judgment for that of the Commissioner. *Qualls v. Apfel*, 206 F.3d 1368 (10th Cir. 2000); *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994). The Court will, however, meticulously examine the entire record to determine if the Commissioner's determination is rational. *Williams*, 844 F.2d at 750; *Holloway v. Heckler*, 607 F. Supp. 71, 72 (D. Kan. 1985).

"The finding of the Secretary[5] as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is that amount and type of evidence that a reasonable mind will accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Williams*, 844 F.2d at 750. In terms of traditional burdens of proof, substantial evidence is more than a scintilla, but less than a preponderance. *Perales*, 402 U.S. at 401. Evidence is not substantial if it is overwhelmed by other evidence in the record. *Williams*, 844 F.2d at 750.

This Court must also determine whether the Commissioner applied the correct legal standards. *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The Commissioner's decision will be reversed when he uses the wrong legal standard or fails to clearly demonstrate reliance on the correct legal standards. *Glass*, 43 F.3d at 1395.

---

[5] Effective March 31, 1995, the functions of the Secretary of Health and Human Services ("Secretary") in social security cases were transferred to the Commissioner of Social Security. P.L. No. 103-296. For the purpose of this Order, references in case law to "the Secretary" are interchangeable with "the Commissioner."

### III.  ADMINISTRATIVE LAW JUDGE'S DECISION

The ALJ concluded that Plaintiff retained the ability to perform a full range of light work. [R. at 24].  The ALJ found Plaintiff's testimony as to her limitations not credible.  The ALJ noted that Plaintiff's objective tests indicated Plaintiff's abilities exceeded the abilities that Plaintiff testified she was capable of performing.  The ALJ additionally noted that Plaintiff had a weak work record which indicated a lack of motivation to work.  [R. at 24].  The ALJ found that work existed in the national economy which Plaintiff could perform, and that Plaintiff was therefore not disabled.  [R. at 27].

### IV.  REVIEW

**RFC NOT SUPPORTED BY SUBSTANTIAL EVIDENCE**

Plaintiff initially asserts that the ALJ erred in determining an RFC for Plaintiff that does not include all of Plaintiff's impairments.  Within this issue, Plaintiff raises numerous errors on appeal.  Plaintiff asserts that the RFC, as determined by the ALJ has no support in the record, and that the lifting 20 pounds occasionally and 10 pounds frequently requirement is not contained in the record.  Although the ALJ does not devote a substantial amount of the decision to the discussion of Plaintiff's RFC, the record does contain an RFC by a non-examining and non-treating doctor, Paul Woodcock, M.D.  Dr. Woodcock reviewed Plaintiff's file and concluded that Plaintiff could occasionally lift 20 pounds and frequently lift ten pounds.  [R. at 150].

Plaintiff additionally asserts as an error that the ALJ did not properly discuss the opinions of Plaintiff's treating physicians, the treatment record, or give appropriate weight

to the opinions of Plaintiff's treating physicians.  Plaintiff asserts that nothing but the ALJ's own opinion supports the ALJ's finding that Plaintiff can perform light work.

The "treating physician rule" requires that the Commissioner give more weight to a treating source than to that of a non-treating source.  *Langley v. Barnhart*, 373 F.3d 1116 (10th Cir. 2004); 20 C.F.R. § 404.1527(d)(2).  "In deciding how much weight to give a treating source opinion, an ALJ must first determine whether the opinion qualifies for 'controlling weight.'"  *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003).  The ALJ, in making this determination, first should consider "whether the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques.  If the answer to this question is 'no,' then the inquiry at this stage is complete.  If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record.  [I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight."  *Langley,* 2004 WL 1465774; *Hamlin v. Barnhart*, 365 F.3d 1208 (10th Cir. 2004) ("The ALJ is required to give controlling weight to the opinion of a treating physician as long as the opinion is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record."); *Watkins v. Barnhart*, 350 F.3d 1297 (10th Cir. 2003) ("The analysis is sequential.  An ALJ must first consider whether the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques.").

In *Robinson v. Barnhart*, 366 F.3d 1078 (10th Cir. 2004), the Tenth Circuit Court of Appeals discussed the analysis the ALJ should make in evaluating a treating physician's opinion.

> An ALJ must first consider whether the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques." SSR 96-2p, 1996 WL 374188, at *2. If the answer to this question is "no," then the inquiry at this stage is complete. If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record. In other words, if the opinion is deficient in either of these respects, then it is not entitled to controlling weight.

If the ALJ concludes that the treating physician's opinion is not entitled to controlling weight, the inquiry does not end. The ALJ must then evaluate whether the treating source medical opinions are entitled to deference and the ALJ must weigh the treating opinion using all of the factors provided in § 404.1527. *See Langley*, 2004 WL 1465774; *Hamlin*, 365 F.3d at 1215 (ALJ must consider specific factors in determining what weight to give medical opinion). The factors which the ALJ should evaluate include:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.* at 290; 20 C.F.R. § 404.1527(d)(2)-(6). *See also Watkins*, 350 F.3d at 1300 (resolving "controlling weight" issue is not end of review; ALJ must evaluate treating physician opinion factors).

Plaintiff asserts that one of Plaintiff's treating physician's is Dr. Weaver. Dr. Weaver initially treated Plaintiff in 2001. In April 2004 Dr. Weaver completed a Lumbar Spine RFC on Plaintiff noting that an MRI indicated degenerative arthritis of Plaintiff's spine. He concluded Plaintiff could sit for two hours, stand for fifteen minutes, walk less than two

hours, and frequently or occasionally lift less than ten pounds. [R. at 183]. The ALJ's sole discussion of Dr. Weaver's opinion is that the opinion is inconsistent with the record as a whole and therefore is not given great or controlling weight. The ALJ does not articulate in what manner Dr. Weaver's opinion is inconsistent with the record as a whole, and certainly some evidence in the record supports Dr. Weaver's conclusions. Regardless, as discussed in the case law, the duty of the ALJ is not discharged simply by a conclusion that the treating physician's opinion should not be given controlling weight. The ALJ is also required to evaluate whether the treating source medical opinions are entitled to deference and the ALJ must weigh the treating opinion using all of the factors provided in § 404.1527. The ALJ never weighed any of the factors discussed in § 404.1527.

Defendant asserts that Dr. Weaver is not appropriately considered a treating physician and discusses the frequency of examinations by Dr. Weaver to support Defendant's conclusions. However, the ALJ appears to treat Dr. Weaver as a treating physician because the ALJ discusses the amount of weight to be given to Dr. Weaver's opinion. The ALJ does not otherwise discuss that Dr. Weaver is not a treating physician. On remand the ALJ should determine whether or not Dr. Weaver is a treating physician and if so apply the appropriate treating physician standards.

Plaintiff was given a 40% impairment to the whole person by Dr. Martin with a notation that she undergo vocational rehabilitation to learn a more sedentary type of employment in 2002. [R. at 142]. In 2003 Dr. Martin wrote that he believed Plaintiff was 100% temporarily totally disabled. [R. at 159]. With regard to Dr. Martin's opinion, the ALJ notes that a conclusion of disability is left to the determination of the ALJ. The ALJ does not otherwise discuss or explain the weight given to Dr. Martin's opinion. From the record

it is not clear that Dr. Martin is a treating physician. However, the ALJ does not discuss whether or not he considered Dr. Martin's opinion as a treating doctor.

On remand, the ALJ should review the opinions and medical records of Plaintiff's doctors. The ALJ should note which doctors he considers as treating physicians, and evaluate those treating physician opinions given the applicable case law and regulations.

Dated this 21st day of December 2006.

*Sam A. Joyner*
Sam A. Joyner
United States Magistrate Judge